UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA                :

            - v. -                      :    07 Cr. 672 (RJH)

JHAMEL SEAN FRANCIS,                    :
KENNETH FRANCIS,
CLAUDIA FRANCIS,                        :
EBONY DENNIS,
DOMINIK RAWLE and                      :
LENNIE A. NURSE, JR.,

                                        :
            Defendants.
                                        :
- - - - - - - - - - - - - - - - - -x


**THE GOVERNMENT'S POST-HEARING MEMORANDUM OF LAW IN RESPONSE
TO DEFENDANT CLAUDIA FRANCIS'S MOTION TO SUPPRESS**


                            MICHAEL J. GARCIA
                            United States Attorney for the
                            Southern District of New York
                            One Saint Andrew's Plaza
                            New York, New York 10007


Antonia M. Apps
Assistant United States Attorney
     -Of Counsel-

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE EVIDENCE . . . . . . . . . . . . . . . . . . . 2

    A.   Special Agent Cordel James . . . . . . . . . . . 2
    B.   Special Agent Julie Brown . . . . . . . . . . . . 7
    C.   Detective Donald Messe . . . . . . . . . . . . .8
    D.   Special Agent Vito Mauirano . . . . . . . . . . 10
    D.   Special Agent Russell Castrogiovanni . . . . . . . 11

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . 14

I.   The Items In Plain View Should Not Be Suppressed . . . . .14

II.  Law Enforcement Did Not Conduct a Full-Scale
    Warrantless Search . . . . . . . . . . . . . . . . . .19

    A.   The "Search Incident to Arrest" Language . . . . . . 19
    B.   Serial Numbers . . . . . . . . . . . . . . . . 20
    C.   The Receipts Seen By Detective Messe . . . . . . . 23
    D.   The Inventory Lists . . . . . . . . . . . . . .24

III. The Search Warrant Was Valid . . . . . . . . . . . . .26

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . 28

# TABLE OF AUTHORITIES

## CASES

<u>Arizona</u> v. <u>Hicks</u>,
   480 U.S. 321 (1987) . . . . . . . . . . . . . . . . . 20, 21

<u>Franks</u> v. <u>Delaware</u>,
   438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . 22

<u>Horton</u> v. <u>California</u>,
   496 U.S. 128 (1990) . . . . . . . . . . . . . . . . . . 14

<u>United States</u> v. <u>Awadallah</u>,
   349 F.2d 42 (2d Cir. 2003) . . . . . . . . . . . . . . 22

<u>United States</u> v. <u>Canfield</u>,
   212 F.3d 713 (2d Cir. 2000) . . . . . . . . . . . . . . 22

<u>United States</u> v. <u>Kiyuyung</u>,
   171 F.3d 78 (2d Cir. 1999) . . . . . . . . . . . . . . 14

<u>United States</u> v. <u>Morales</u>,
   280 F. Supp. 2d 262 (S.D.N.Y. 2003) . . . . . . . . . . 26

<u>United States</u> v. <u>Travisano</u>,
   724 F.2d 341 (2d Cir. 1983) . . . . . . . . . . . . . . 26

**PRELIMINARY STATEMENT**

The Government respectfully submits this Post-Hearing Memorandum of Law in response to defendant Claudia Francis's post-hearing letter dated April 29, 2008 ("Def's Ltr."). As the testimony and exhibits at the suppression hearing demonstrated, when law enforcement arrested Claudia Francis in her home on June 28, 2007, they conducted a proper protective sweep of her residence. During that security sweep, law enforcement saw, in plain view, numerous items whose incriminating character was immediately apparent: approximately 50 gift cards, receipts in the names of at least one of the victims of the defendant's fraudulent credit card scheme, and the type of high-end electronics that the defendant had purchased with other individual's credit cards without authorization. Under the "plain view" exception to the Fourth Amendment, this evidence should not be suppressed.

The evidence at the hearing further established that, after seeing this evidence, law enforcement decided to obtain a search warrant to seize any other relevant evidence that might be located in the residence or on the computers they had seen in the house during the protective sweep. Law enforcement properly secured the house pending obtaining the search warrant, and did not carry out the search until the search warrant was in fact signed by a United States Magistrate Judge. The defendant's allegations that law enforcement conducted a "full-scale

warrantees search" before the search warrant was signed are
baseless.  Moreover, since the search warrant was not based on
any improperly obtained evidence, this Court should give due
deference to the Magistrate Judge's determination that there was
probable cause to search the house and the computers for
additional evidence and fruits of the defendant's fraudulent
scheme.  Thus, the defendant's motion to suppress should be
denied.

**SUMMARY OF THE EVIDENCE**

A.    <u>Special Agent Cordel James</u>

Special Agent Cordel James has been employed by the FBI
for a little over three years.  <u>See</u> Suppression Hearing
Transcript, dated April 8-9, 2008 ("Tr.") at 4.  Agent James
began investigating this case in 2007.  <u>Id</u>. at 5.  She learned
that the defendant, along with other members of her extended
family, were engaged in a credit card fraud scheme whereby they
obtained credit cards belonging to other persons, and used those
credit cards to purchase goods, including high-end electronics,
and gift cards.  <u>Id</u>. at 16-17, 22, 27.[1]  When purchases were made
with the victim credit cards at the Nordstrom's store, the
defendant would return the goods purchased to her own bank
account.  Agent James walked through a particular purchase and

---

[1] The Government also introduced various receipts showing
purchases with victim cards at electronics stores, three of which
were found in Claudia Francis' house.  <u>See</u> Exhs. 5-7.

return at Nordstrom's, which showed a credit to the defendant's bank account of items purchased with another person's credit card.  Id. at 9-15.

Law enforcement planned to arrest Claudia Francis on June 28, 2007, at her home located at 137-07 Frankton Street, Rosedale, New York.  Tr. 27.  In advance of the arrest, Agent James briefed the arrest team as to the nature of the case and the circumstances that could be expected at the time of arrest. Id. at 27-28.

On the day of arrest, Agent James remained at FBI headquarters to coordinate the arrests of six defendants, including Claudia Francis.  Id. at 29.  A little after 6:00 a.m., Agent James spoke with the arrest team leader for Claudia Francis (Agent Julie Brown), and was informed that Claudia Francis was not responding to law enforcement knocking on her door.  Through subsequent telephone calls, Agent James learned, among other things, that there were buzzing sounds coming from the house, and that law enforcement ultimately gained entry through an open window.  Id.  Agent James also learned that, after they entered the residence, and while they were effecting the arrest of Claudia Francis, agents saw in plain view approximately 50 cards believed to be gift cards or credit cards, a shredder, and electronics equipment such as flat-screen televisions and computers, as well as receipts in the names of other individuals,

3

including a known victim of the fraudulent scheme.  Id. at 30.
Based on this information, the Government decided to try to get a
search warrant.  Id.

In conjunction with the United States Attorney's
Office, Agent James prepared an application for a search warrant,
and presented the search warrant to Magistrate Judge Marilyn D.
Go of the Eastern District of New York.  Tr. at 31, 43.  The
judge signed the search warrant at approximately 6:37 p.m. on
June 28, 2007.  See Exh. 8 at 1.  The Affidavit in support of the
search warrant set forth the background to the investigation, the
charges against the defendant, and some of the transactions that
formed a part of the fraudulent scheme.  Although the search
warrant did not specify what particular goods were purchased with
the victim credit cards, it explained that the compromised credit
cards were used to effect unauthorized transactions worth more
than $100,000.  Exh. 8 ¶ 7(f).  In addition, the search warrant
affidavit incorporated the Complaint by reference.  Exh. 8 ¶ 3.

The search warrant affidavit also stated that when FBI
agents did a "sweep" of the house, they saw "in plain [view] a
shredder containing shredded credit cards and/or gift cards,
[and] approximately 50 gift cards."  Exh. 8 ¶ 5.[2]  The search

---

[2]On cross-examination, Agent James was asked about a
reference in the search warrant affidavit to what agents had seen
in plain view "upon a search of the house incident to arrest."
Tr. 41.  Agent James explained that this statement was
referencing the process whereby the agents "cleared" the house

warrant set forth the various electronic items that were in plain view, including the televisions and five computers. The search warrant stated that there was probable cause to believe the electronic items were purchased with the victim credit cards, id. ¶ 8, and that there were documents and other physical items in the house relating to the conspiracy. Id. ¶ 9. The affidavit further stated that, based on the Agent James' experience and conversations with others, there was probable cause to believe that the computers contained evidence of the crimes charged in the Complaint. Id. ¶ 11, 12. The affidavit then set forth the various methods by which the computer should be searched. Attachment A to the search warrant listed, as items to be seized and searched, the five computers, two safes and the contents thereof, the other electronic equipment in the house, and various computer hardware and software. A number of paragraphs in the attachment are devoted to the searching of the computers and other electronically stored information.

        The search warrant also lists serial numbers for the five computers (and a printer) found in the house. Exh. 8 ¶ 6. Agent James testified that, unlike the information about the gift cards and other items in plain view in the house, the serial numbers were obtained "much later" in the day. Agent James had

---

during the arrest of Claudia Francis. Id. at 42-43, 100. It did not mean that the agents conducted a full-scale search of the house.

specifically asked Special Agent Russell Castrogiovanni, who had stayed at Claudia Francis' house to secure the premises pending getting the search warrant, to get those numbers for the search warrant. Tr. 33.

After the judge signed the warrant, Agent James called Agent Castrogiovanni and told him what the search warrant authorized him to search for. Tr. 34-35. She did not read the entire Attachment A to him, rather provided the details as to what to search for as she was looking through the attachment. Id. at 35. Agent James then drove to Claudia Francis' house, arriving at about 8:00 p.m. Id. at 25. After giving Gary Francis a copy of the search warrant, she helped the agents complete the search of the house. Specifically, she searched the two safes in the house for relevant materials, so that the safes could be left behind, and then assisted the other agents in completing the search. When Agent James and the other agents left the house, it was approximately 10:00 p.m., id. at 37, and they took with them any paper and food items they had brought in.

B.    Special Agent Julie Brown

Special Agent Julie Brown was the "team leader" for the arrest of Claudia Francis on June 28, 2007. Tr. 106. The arrest team consisted of eight individuals: four officers from the Nassau County Police Department and four FBI agents. Id. at 109-111. On the day of arrest, the arrest team proceeded to Claudia

Francis' house at approximately 6:00 a.m.  Members of the arrest team knocked on the front door of the house for several minutes with no answer.  Id. at 112.  Agent Brown then called various telephone numbers she had for Claudia Francis, while other team members talked to the occupants of the basement apartment.  Id. at 112-13.  Agent Brown received a telephone call back from a female who wouldn't identify herself, and Agent Brown asked her to open the front door.  Id. at 113.  Other arrest team members at the rear of the house heard a buzzing noise coming from the house.  Finally, law enforcement gained entry through a window in the front of the house.  Id. at 114.  Agent Brown then went in through the front door.  Id.

Upon entry, Agent Brown saw Claudia Francis coming from the rear of the house and told her she was under arrest.  Tr. 114.  Agent Brown accompanied Claudia Francis into her bedroom, presumably while Claudia Francis either got dressed or retrieved her passport which was in a safe in her bedroom.  Id. at 115.[3] Approximately 15 minutes after entry, Claudia Francis was taken to a car and driven to the FBI White Plains office to be

---

[3]Agent Brown, who did approximately a dozen arrests in 2007 alone, Tr. 117, could not recall why they went into the bedroom. However, she also testified that it was FBI procedure both to ask arrestees for their passports and to accompany an arrestee once inside the arrestee's house, id., at 114-5, and Claudia Francis submitted an affidavit stating that she was asked for her passport and retrieved it from a safe in her bedroom, which Claudia Francis then placed on her bed.  See Claudia Francis Afft. ¶ 3.

processed.  Id. at 117.  Before Agent Brown drove Claudia Francis
to the station, however, she reported back to Agent James and her
supervisor what others had seen during the arrest, namely the
gift cards and high-end electronics, and suggested that they
consider getting a search warrant.  Id. at 116, 124.

    C.    Detective Donald Messe

         Detective Messe has been a police officer with the
Nassau County Police Department for 35 years, and has conducted
between 75 and 100 search warrants in his career.  Tr. 127.  He
was a member of the arrest team for Claudia Francis on June 28,
2007.  Id. at 127.  Detective Messe first learned of the Francis'
credit card fraud scheme in 2006 when the Nassau County Police
Department was investigating the case.  Id. at 128.  He had also
received a complaint from a victim of the scheme, whose last name
was Kornobis, in March 2007.  Id.

         On the morning of the arrest, Detective Messe was
standing on the side of the house.  Tr. 133.  From that vantage
point, after several loud knocks on the front door by other
agents, Detective Messe observed the blinds in a window at the
back of the house make a sudden move – "consistent with someone
opening a door and changing the air pressure in the room."  Id.
Five to seven minutes later, he moved closer to the house, and
heard a noise coming from a pair of window in the middle of the
house.  Id. at 134.  The noise was "an intermittent mechanical

8

grinding, humming type noise." Id.  Detective Messe estimated
that it was half an hour before law enforcement gained entry to
the house from the time agents first arrived at the scene.  Id.
at 135.

Upon entering the house, Detective Messe conducted a
protective sweep, which took two or three minutes.  Tr. 137-38.
He walked through the living room, which opened into the dinning
room through an archway, and then turned right into the kitchen,
and right again, down a hallway towards the front door.  Id. at
136, 158.  During this walkthrough, he noticed a large flat-
screen television, computers and other electronic equipment, and
a shredder which had a "clear or semitransparent plastic bin, and
that bin was loaded with chopped-up shards of multicolored credit
cards."  Id. at 136.  He also saw a store receipt or electronic
store warranty partially sticking out of a drawer in the living
room, which he pulled out of the drawer.  Id. at 137.[4]  He saw
credit or gift cards on a table in the dining room, and on the
kitchen counter.  Id. at 133, 152.  After the protective sweep,

_____

[4]On cross-examination, Detective Messe stated that it looked
like an electronics store customer folder that would contain a
warranty and receipt, and he recalled the receipt sticking out of
the folder.  Tr. 148-50.  He believed that about 2 to 3 inches of
the folder was sticking out of the drawer.  Id.  Upon opening the
folder, he saw that it was for an electronics purchase.  Id. 150.
He then put the folder on the counter top.  Id.  Detective Messe
stated that the act of pulling out the receipt opened the drawer
by a few inches, and that he went back later and closed the
drawer.  Id. at 150, 154.

9

Detective Messe spent the next few hours at the front door.  Id. at 139.  He then came into the living room to sit down.  When he sat down in a chair in the living room, he saw another receipt on the table next to the chair.  That receipt had the name "Kornobis" on it, a name he recognized as a victim in the Francis credit card fraud scheme.  Id. at 140.  The receipt was an electronics store receipt.  Id.  Detective Messe recalled relaying this information to the FBI agents at round lunch time. Id. at 141.  Detective Messe then left the house.

### D.   Special Agent Vito Maiurano

Agent Maiurano was also a member of Claudia Francis' arrest team.  When Agent Maiurano entered the house, he observed Agent Brown speaking to Claudia Francis, and Claudia Francis was wearing shorts and a T-Shirt.  Tr. 163.  He overheard Agent Brown tell Claudia Francis that they should get proper clothes for her. Id.  He then observed Agent Brown and the defendant go towards the back of the house (where Claudia Francis' bedroom was).  Id. at 164.  Agent Maiurano transported Claudia Francis to the station.  Id.  However, he returned to the house in the afternoon at the request of a supervisor.  Id. at 164-65.  Once at the house, Agent Maiurano waited with the other agents in the living room, until Agent Castrogiovanni got a call from Agent James telling him that a search warrant had been obtained.  Id. at 166, 170.  After the call from Agent James, Agent Mauirano was

10

instructed by Agent Castrogiovanni to make a diagram of the house
(<u>see</u> Exh. 3503-A), and later helped Agent Catrogiovanni complete
the inventory sheets, by verifying the numbers of the gift cards
they had found.  <u>Id</u>. at 169.

    E.   <u>Special Agent Russell Castrogiovanni</u>

      Special Agent Castrogiovanni, an FBI agent of seven
years, was a member of Claudia Francis' arrest team on June 7,
2007.  Tr. 163.  Upon entering the house, Agent Castrogiovanni
conducted a protective sweep of the bedrooms in the back of the
house.  <u>Id</u>. 206.  He then stood in the living room towards the
front of the house.  While in the living room, he saw electronic
equipment, a "lot of" gift cards on the coffee tables, and a
clear plastic shredder.  <u>Id</u>. at 208.  Claudia Francis was taken
out of the house approximately 10 or 15 minutes later.  <u>Id</u>. at
207.  After she was taken out of the house, Agent Castrogivoanni
received a call from his supervisor.  Agent Castrogiovanni
reported what he had seen, and his supervisor told him that the
FBI was going to get a search warrant.  <u>Id</u>.

      Agent Castrogiovanni was instructed to secure the
premises until the search warrant was obtained.  <u>Id</u>. at 209.
Agent Castrogiovanni decided that the best place to secure the
house was from the living room, because there was an internal
door leading to the apartment next door opposite the living room.
<u>Id</u>. at 210-11.  Other than bathroom breaks and going out to his

car, Agent Castrogiovanni stayed in the living room all day until he got the call from Agent James between 6:30 p.m. and 7:00 p.m. telling him that the judge had signed the search warrant.  Id. There was one exception to this:  at the request of Agent James in the early afternoon, he went into the various rooms to retrieve the serial numbers for the five computers and the two safes that agents had seen in the house during the protective sweep.  Id. at 213-14.[5]  In the course of retrieving these numbers, he moved the respective computers to view the numbers on the back of the items, but he did not otherwise conduct any search of the rooms in which the computers were located.  Id. at 214-15.

During the day, Agent Castrogiovanni started to fill out some fo the inventory sheets that comprise Exhibit 12.  Id. at 217.  In particular, he started recording the items that were in plain view in the living room and dining room, where he was sitting.[6]  Id. at 218-19.  Otherwise, the inventory list was

---

[5]Agent Catrogiovanni did not recall exactly what electronic equipment he was asked to obtain serial numbers for.  Tr. 214. However, the search warrant contains only serial numbers for the computers (and a printer) and the safes, and since the serial numbers were obtained at the request of Agent James, it is a reasonable inference that he obtained only the numbers that appear in the search warrant.

[6]The living room opened into the dining room and were separated only by a short wall.  See 3503-A (sketch by Agent Maiurano).

12

filled out after Agent James called Agent Castrogiovanni at approximately 6:45 p.m. in the evening.  Id. at 219.

Page ten of the Inventory sheets initially included the two safes as Items 5 and 6.  These items were subsequently crossed out after Gary Francis agreed to allow agents to search the safes at his house.  Agent Castrogiovanni had informed Gary Francis earlier in the day that the safes were part of the search warrant, but that the agents would leave the safes behind and simply take the contents they thought relevant, if Gary Francis would prefer that.  Tr. 222.  At first, Gary Francis did not want to do that, but later changed his mind, after the agents had commenced the search.  Id.  Thus, when Agent Castrogiovanni initially filled out the sheets for the room containing the safes – which was after Agent James' call – he included the safes.  But when Gary Francis later allowed Agent James to search the safes, so that the FBI agents could leave the safes and take only their contents, Agent Castrogiovanni crossed the safes off the list, and added two new sheets for the contents of the safes.  Id. 222-23; Exh. 13.

Agent Castrogiovanni left the house with the other agents at approximately 10:00 p.m.  Tr. 221; Exh. 3504-A.

13

## ARGUMENT

Most of the evidence seized from Claudia Francis' house on June 28, 2007 – the 50 gift cards, the shredder, various receipts in other individuals names, and the electronic equipment such as the computers – was evidence that was in plain view during the protective sweep properly and lawfully conducted by law enforcement after they entered the house.  The defendant does not dispute that the 50 gift cards, shredder, and electronic equipment were immediately apparent upon walking through the house.  Rather, she argues that because no witness testified that the items seized were immediately incriminating and because the shredder and credit cards were not offered into evidence, the plain view exception cannot apply.  Additionally, the defendant claims that what started out as a proper protective sweep "quickly became a full-scale warrantless search."  Def's Ltr. at 1.  These arguments should be rejected for the reasons set forth below.

## I.    The Items In Plain View Should Not Be Suppressed

Under the "plain view" exception to the Fourth Amendment, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."  Minnesota v. Dickerson, 508 U.S. 366, 375 (1993); see also Horton v.

14

<u>California</u>, 496 U.S. 128, 135 ((1990) ("an object that comes into view during a search incident to arrest that is appropriately limited in scope under existing law may be seized without a warrant"); <u>United States</u> v. <u>Kiyuyung</u>, 171 F.3d 78, 83 (2d Cir. 1999) ("Patently incriminating evidence that is in plain view during a proper security check may be seized without a warrant.").

As noted, there is no dispute that the 50 gift/credit cards, the shredder, and the electronic equipment were immediately visible upon a walk-through of the house.  However, the defendant contends that the receipts seen by Detective Messe could not have been in plain view, arguing that Detective Messe's testimony was "concocted."  Def's Ltr. at 2.

Detective Messe recalled finding two receipts in the house.  The first was in a folder sticking out of a drawer in the living room.  The second was a receipt he saw on a coffee table next to a chair in the living room with the name "Kornobis." Detective Messe he recalled seeing the second receipt a few hours later when he sat in the living room after having stood at the front door since Claudia Francis' arrest.  The defendant argues that because Agent Castrogiovanni testified "that the detective found the Kornobis receipt in a drawer" at around 7:00 a.m., Detective Messe must have been lying about seeing the second receipt in plain view when he sat down.  Def's Ltr. at 2.

15

The defendant's attempt to manufacture an inconsistency where there are plausible innocent explanations for this testimony should be rejected. First, it is possible that the first receipt found by Detective Messe had a victim's name on it, but that he no longer recalled the name on that receipt by the hearing.[7] Or it may be that Agent Castrogiovanni's recollection conflated two statements by the detective – the earlier statement of discovering an electronic receipt in a drawer and the later statement discovering a receipt in a victim's name. Tr. 227-28. Since Agent Castrogiovanni was in the living room securing the house for most of the day, it is highly likely he was present for both statements. Moreover, Agent Castrogiovanni credibly testified that he did not see anyone search through a drawer in the living room, as defendant suggests.

The defendant further argues that Detective Messe must have opened a drawer and searched through it based on Gary Francis' untested assertion in his affidavit that when he came home that evening, he saw "a side table in the living room" with an open drawer whose contents had been removed. Def's Ltr. at 2. As an initial matter, since Gary Francis did not testify, it is not clear whether he is even talking about the same table or drawer that Detective Messe testified about. Further, Gary

---

[7]The Government offered two exhibits at the hearing which were receipts found at Claudia Francis' name – Exhibits 6 and 7 – bother were from electronics stores; both were in Kornobis' name.

16

Francis was not at home when the agents arrived in the morning;
the drawer could have been opened by Claudia Francis the night
before.  Moreover, since Gary Francis' affidavit is clearly wrong
on other details of the day's events, the Court should credit
Detective Messe's version of events over those of Gary Francis.
For example, Gary Francis states in his affidavit that the agents
left about 45 minutes after Agent James arrived at the house at
about 7:30 p.m.  However, Agent Castrogiovanni noted in a report
that the agents in fact left by 10:00 p.m. at night, see Exh.
3504-A, nearly two hours after Gary Francis stated they had left.
This time of departure was corroborated by the other agents who
conducted the search in the evening.  See, e.g., Tr. 37 (Agent
James).[8]

     The defendant also argues that because no witness
specifically testified that the incriminating character of the
items seized was immediately apparent, the plain view exception
to the Fourth Amendment does not apply.  Def's Ltr. at 3.  This
position is absurd.  It is obvious that 50 gift cards and a

---

[8]Additionally, there would be absolutely no reason for
Detective Messe to concoct a story about the receipts.  He was a
detective of 35 years experience who had conducted numerous
search warrants over his career.  He knew that the FBI was
preparing a search warrant, and an officer of his experience
would have known that, given the presence of the gift cards and
shredder and the background to the investigation which he was
familiar with, the warrant was likely to be granted.  As such,
there would be no point to conducting a "full-scale search"
before the warrant was signed.

17

shredder with shredded gift cards in it were incriminating on their face, particularly given that the agents knew that the defendant's fraudulent credit card scheme involved gift cards, and Detective Messe had heard a buzzing noise coming from the house when the agents unable to enter the house early in the morning. Similarly, credit card receipts in other peoples names are incriminating on their face in the context of a fraudulent scheme whereby the defendant has been using other individuals' credit cards, particularly when law enforcement recognized a name on a receipt as belonging to a known victim of the defendant's credit card scheme. Finally, the large number of items of expensive electronic equipment was similarly incriminating on its face in the context of a credit card scheme where numerous electronics have been purchased with the stolen credit cards.

Nor was the Government required to introduce the 50 gift cards themselves and the shredder into evidence. Numerous witnesses testified that these items were in plain view in the house, and the defendant did not dispute this fact, although she testified and submitted an affidavit. There is no requirement that the incriminating items be introduced as separate exhibits at a suppression hearing, where hearsay is permitted.

18

## II. Law Enforcement Did Not Conduct A Full-Scale Warrantless Search

The defendant concedes that when the agents first entered the house, they conducted a proper protective sweep. However, the defendant claims that this protective sweep became a "full-scale warrantless search" and was therefore improper. In support of this claim, the defendant points to: (1) the use of the phrase "search incident to arrest" by Agent James in the search warrant affidavit; (2) the fact that the search warrant affidavit contained the serial numbers of the computers that were seized; (3) the fact that Detective Messe pulled a receipt out of drawer and later closed the drawer; (4) and the fact that the inventory lists were detailed and long, therefore they must have been filled out in advance. None of these alleged facts support the defendant's contention.

### A.  The "Search Incident to Arrest" Language

The defendant seizes on Agent James' statement in the search warrant affidavit that agents had seen items in plain view "upon a search of the house incident to arrest," claiming it indicates that the agents conducted a full-scale search before the warrant was signed by the judge. Def's Ltr. at 1. However, Agent James, who is not a lawyer, testified that she understood this phrase to mean that the agents conducted a protective sweep of ths house. This testimony is consistent with other language in the search warrant affidavit. See Exh. 8 ¶ 5 ("When FBI

19

agents arrived at the PREMISES, they did a sweep of the house and saw in plain [view] a shredder containing shredded credit cards and/or gift cards, [and] approximately 50 gift cards . . .”). Moreover, the testimony of the other agents at the hearing corroborated Agent James' understanding that agent conducted only a limited protective sweep after entering the house.

      B.   <u>Serial Numbers</u>

      The defendant argues that the agents must have conducted a full search of the house before the search warrant was obtained because the serial numbers of the five computers and one printer appear in the search warrant affidavit.  Def's Ltr. at 1 (citing <u>Arizona</u> v. <u>Hicks</u>, 480 U.S. 321 (1987)).  While it is correct that the serial numbers for the computers were retrieved by Agent Castrogiovanni before the search warrant was obtained, and in order to retrieve them, he had to move the items so as to view the backs of the computers, it is equally clear that, other than the limited action involved in obtaining the serial numbers, no further search of the house was carried out.  <u>Supra</u> at 12.

      Moreover, <u>Hicks</u> is distinguishable.  In <u>Hicks</u>, after a bullet was fired through the floor of the defendant's apartment into the apartment below, police officers entered into the defendant's apartment (without a warrant) to search for the shooter, for victims, and for the weapons.  480 U.S. at 323.  One of the officers noticed that the apartment contained expensive

20

stereo equipment, and suspected it was stolen.  The serial numbers were traced to stolen property.  The Court held that moving the equipment to obtain the serial numbers was a separate search because it was "unrelated to the objective of the authorized intrusion."  Id. at 324.

In Hicks, the stereo equipment was the fruits of a crime of which the police were entirely unaware when they entered the apartment without a warrant.  Here, by contrast, the police entered the apartment with a warrant to arrest a defendant accused of a credit card fraud where those credit cards had been used to purchase electronic equipment.

Moreover, in this case, unlike Hicks, the serial numbers were not relevant to the Magistrate Judge's probable cause analysis.  Thus, there is no claim that, based on the serial numbers, the computers were in fact purchased by stolen credit cards.  The search warrant affidavit set forth the probable cause for searching the hard drives of the computers based on, among other things, the history of the defendant's conduct and Agent James' experience with credit card fraud suspects' use of computers to further their criminal activity. See Exh. 8 (indicating hat the computers would likely contain evidence of the crime of access device fraud).  The serial numbers were merely inserted into the search warrant affidavit to

specify which computers were to be searched by the FBI computer analytical team.[9]

In the alternative, the Court should simply excise the serial numbers from the search warrant affidavit, and determine whether the remaining portion of the affidavit supports probable cause to issue the warrant under the rule in <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978). "If [after excising the tainted portions] the corrected affidavit supports probable cause, the inaccuracies were not material to the probable cause determination and suppression is inappropriate." <u>United States</u> v. <u>Awadallah</u>, 349 F.2d 42, 65 (2d Cir. 2003) (quoting <u>United States</u> v. <u>Canfield</u>, 212 F.3d 713, 717 (2d Cir. 2000)). The search warrant affidavit states that, based on the affiant's experience with credit card schemes to defraud, computers are commonly used to store evidence of that crime. Exh. 8 ¶ 11. The affidavit also states that computers inside residences are usually used to store documents and information, and typically maintain data on their hard drives including email messages. <u>Id</u>. ¶¶ 11, 12. Since personal identification information used to effect credit card fraud is commonly obtained through the Internet, and information from the Internet is often stored on computer systems, particularly when they are in a residence, there is sufficient probable cause to

---

[9]As of today, the computers have not yet been searched by the FBI.

support the search of the computers with the serial numbers excised from the search warrant.

C.    The Receipts Seen By Detective Messe

The defendant argues that Detective Messe's testimony that he saw a store warranty sticking out of drawer that looked like a folder from an electronics store is "incredible on its face," and should not be believed because it is inconsistent with Claudia Francis' testimony.  However, there is nothing incredible about the notion that a large receipt, recognizable to an experienced Detective who had been investigating the credit card fraud scheme in this case as an electronics store warranty, caught his attention during a protective sweep of the house.  Nor is there anything surprising about how pulling the folder out of the drawer left the drawer partially open, and that he felt he should close the drawer later.

Claudia Francis' testimony that the drawer was not of the type that could be "partially open" should not be credited. Claudia Francis submitted a sworn affidavit in which she stated that she actually opened the door for the agents.  Claudia Francis Afft.  ¶ 2.  But it was clear from the agents' testimony at the hearing that, despite considerable knocking on the front door of her house for at least 20 minutes, during which time Claudia Francis was likely shredding gift cards (given the buzzing sound Detective Messe heard), the agents actually gained

23

entry through an open window.  At the hearing, Claudia Francis
gave both versions of events – that she did and did not open the
door – when she was challenged about how the agents actually
entered her house.  Tr. at 271-72.

In any event, even if the Court were to conclude that
Detective Messe should not have pulled the receipt out of the
drawer, this conclusion would not affect the validity of the
search warrant because the search warrant affidavit did not
mention the fact that receipts in other individual's names were
found at the house.  Thus, the search warrant was not based on
any tainted evidence.

D.    The Inventory Lists

The defendant argues that the search warrant
inventories indicate that the agents conducted an improper search
before they got the search warrant because the inventory lists
were partially filled out before the judge signed the warrant.
Notwithstanding the defendant's attempts to confuse the sequence
of events,[10] it was plain from Agent Castrogiovanni's testimony

_____

[10]The defendant's allegation that Agent Castrogiovanni was
imprecise about how he filled out the inventory lists is
baseless.  Agent Castrogiovanni clearly testified that he wrote
down the items, in particular the gift cards, that were in plain
view in the living and dining room areas.  It was defense counsel
who was confused about the order in which things were filled out
because he mistakenly believed that the sheets were filled out in
the order in which they were numbered at the top right of each
page.  However, Agent Castrogiovanni testified that he did not
place the numbers on the top right of the pages until after he
had completed all of the inventory sheets, and they were not

24

that the only items he filled before a search warrant was obtained were the items that were in plain view in the living and dinning room areas of the house – namely the gift cards.  Since law enforcement was entitled to take these items regardless of whether the judge signed the search warrant – because the items were in plain view – there can be no objection to Agent Castrogiovanni writing these items on the inventory sheets when he did.

The defendant's reliance on the fact that the safes were crossed off the inventory list as demonstrating that a full-scale search was conducted prematurely is equally misplaced. Rather, the fact that the safes were crossed off the list corroborates Agent Castrogiovanni's testimony that Gary Francis initially refused to allow the agents to search the safes, even after the agents in the house learned that the judge had signed the warrant.  It was not until Agent James arrived around 8:00 p.m. that the safes were actually searched for relevant evidence. At that point, Agent Castrogiovanni crossed the safes off the list, because the FBI was no longer going to take the safes with them.

In sum, the evidence at the hearing demonstrated that the agents did not conduct a "full-scale" search of the residence before they were informed that the judge had signed the search

---

assembled in any particular order.

25

warrant.  On the contrary, the facts show that the agents did patiently wait until the warrant was signed.  Agent Castrogiovanni remained at the house the entire day, waiting for the search warrant.  When the search was commenced – shortly after 6:30pm – it still took the four agents who conducted the search until 10:00 p.m. at night to complete the search.  If they had truly started earlier in the day, they would have been able to complete the search much earlier.

**III.    The Search Warrant Was Valid**

The defendant argues that the warrant is defective because it lacks probable cause with respect to the electronic equipment seized.[11]  Def's Ltr. at 4.  As set forth above, if the Court determines that these items were in plain view, and were incriminating on their face given the nature of the fraudulent credit cards scheme that law enforcement knew the defendant was engaged in, the Court need not determine whether the search warrant sets forth probable cause for their seizure.

---

[11]The defendant also contends that the warrant is defective because it did not expressly authorize the agents to seize the gift cards.  Def's Ltr. at 3.  However, law enforcement did not need a warrant to seize the gift cards because they were in plain view.

26

In any event, the search warrant does set forth sufficient facts to support seizure of the electronic equipment. The search warrant affidavit details an extensive credit card fraud scheme engaged in by the defendants.  Even though it does not expressly mention that the defendants were purchasing computers, televisions and other electronic equipment with the credit cards, given the scope fo the fraud – over $100,000 – it is a fair inference that electronic items were being purchased. Exh. 8 ¶ 7(e).  Moreover, "[a] magistrate judge's probable cause determination is entitled to 'substantial deference' when reviewed by a district court, and any doubts are to be resolved in favor of upholding the determination." United States v. Morales, 280 F. Supp. 2d 262, 268 (S.D.N.Y. 2003) (citing United States v. Travisano, 724 F.2d 341, 345 (2d Cir. 1983)).

**CONCLUSION**

For the foregoing reasons, the defendant's suppression motion should be denied.

Dated: New York, New York
May 14, 2008

Respectfully submitted,

MICHAEL J. GARCIA
United States Attorney

By:  /s/ Antonia Apps
Antonia M. Apps
Assistant United States Attorney
(212) 637-2198